The STATE of Ohio, Appellee,

v.

URSO, Appellant.

[Cite as *State v. Urso*, 195 Ohio App.3d 665, 2011-Ohio-4702.]

Court of Appeals of Ohio,
Eleventh District, Trumbull County.

No. 2011–T–0005.

Decided Sept. 16, 2011.

Dennis Watkins, Trumbull County Prosecuting Attorney, and LuWayne Annos, Assistant Prosecuting Attorney, for appellee.

Morganstern, MacAdams & DeVito Co., L.P.A., and Michael A. Partlow, for appellant.

CYNTHIA WESTCOTT RICE, Judge.

{¶ 1} Appellant, Keith J. Urso, appeals his conviction, following a jury trial, in the Trumbull County Court of Common Pleas, of operating a vehicle while under the influence of alcohol ("OVI") with a prior felony OVI conviction and a specification of having previously been convicted of five or more OVI offenses within the last 20 years. At issue is whether the trial court erred in denying appellant's motion to suppress the results of his breathalyzer test and his admission of guilt and whether the jury's verdict was against the manifest weight of the evidence. For the reasons that follow, we affirm.

{¶ 2} Appellant was indicted on two counts of OVI. In count one, he was charged with operating a motor vehicle while under the influence of alcohol, having previously been convicted of a felony OVI, in violation of R.C. 4511.19(A)(1)(a) and (G)(1)(e), a felony of the third degree, with a specification that he had previously been convicted of five or more OVI offenses in the last 20 years. In count two, he was charged with operating a motor vehicle with a prohibited blood-alcohol concentration of .286, having previously been convicted of a felony OVI, in violation of R.C. 4511.19(A)(1)(h) and (G)(1)(e), a felony of the third degree, with a specification that he had previously been convicted of five or more OVI offenses in the last 20 years. Appellant pleaded not guilty.

{¶ 3} The state filed a motion to deny pretrial bail, pursuant to Article I, Section 9 of the Ohio Constitution and R.C. 2937.222. Following a hearing, the court granted the state's motion. Appellant appealed the court's ruling, and in *State v. Urso*, 11th Dist. No. 2010–T–0042, 2010-Ohio-2151, 2010 WL 1948329, this court affirmed the trial court's judgment granting the state's motion to deny pretrial bail.

{¶ 4} Subsequently, appellant filed a motion to suppress the result of his breathalyzer test. He also filed a motion in limine to prohibit the state from introducing any evidence regarding his admission of guilt. Following hearings on the motions, the trial court denied both, and the case proceeded to jury trial.

{¶ 5} On January 31, 2010, at approximately 12:45 p.m., Jack Beil was driving north on Bazetta Road in Mecca Township with his wife, Margaret Beil, about one-half mile south of State Route 88. Mr. Beil observed a dark blue Chevrolet Corsica in front of them driving erratically. Mr. Beil was so concerned about the driver's erratic driving that he called 9–1–1. The state introduced a recording of Mr. Beil's 9–1–1 call, in which Mr. Beil said that there was a driver in front of him on Bazetta Road who was going to get into an accident because the driver was driving "all over both sides of the road." Mr. Beil said that the driver stopped in the middle of the road and then started moving again. He said that there were oncoming cars driving on the opposite side of the road and he was concerned that the driver was going to hit them head-on.

{¶ 6} Mr. Beil saw the driver, later identified as appellant, stop at a stop sign at the intersection of Bazetta Road and Route 88 near Monty's Restaurant. In describing appellant to the dispatcher, Mr. Beil said, "I think it's a lady. It's long hair." Appellant then turned east on Route 88 and pulled into Monty's parking lot and stayed in his car. Mr. Beil told the 9–1–1 operator that he was going to stay at the stop sign at Bazetta Road and Route 88, to see if appellant stayed in his car. Mr. Beil then pulled into Monty's parking lot, and told the dispatcher, "She, whatever it is [man or woman] was sitting there with her head back sleeping, clunked out. So, I'll just sit here at Monty's and see * * * when [the sheriff's deputies] come."

{¶ 7} Margaret Beil testified that while she was driving with her husband north on Bazetta Road, a car pulled out in front of them. Appellant was driving slowly, so they had to slow down. Appellant went off the right side of the road. He then returned to the road, crossed the center line, just missing the ditch, then returned to their lane of travel and stopped in the middle of the road. Mrs. Beil had then called 9–1–1 and passed the phone to Mr. Beil, who spoke to the dispatcher.

{¶ 8} Mrs. Beil testified that the car resumed moving, crossed the center line again, and was driving in the wrong lane and in the wrong direction. Two cars were driving in that lane heading toward appellant, and he almost hit them. Appellant stopped again, sat in the road for awhile, and then resumed driving.

{¶ 9} The dispatcher said that she had notified the sheriff's deputies, and Mr. Beil said he would stay with appellant until the deputies arrived. Mrs. Beil then saw appellant stop at the stop sign at Route 88 for four to five minutes.

{¶ 10} Mrs. Beil testified that as they had gotten closer to the vehicle, she had been able to see that the driver had long hair and she thought he might have been a woman. She said that while still stopped at the stop sign, she saw appellant pull into Monty's. Appellant parked his vehicle in the parking lot, put his head back on the head rest, and just sat there. Mr. Beil then drove into Monty's parking lot and parked beside appellant. Mrs. Beil said that except for a few seconds when a pick-up truck passed by appellant's car, she was able to see appellant the entire time from when he was stopped at the stop sign to when he parked at Monty's. Mrs. Beil said that during this entire period, appellant had his head back on the head rest, no one else was in his car, and he did not drink anything.

{¶ 11} Mrs. Beil said they were in the parking lot for about two minutes when a park ranger arrived. She then got out of the car to see if the driver was a man or a woman. Mrs. Beil and the ranger approached appellant's vehicle, and Mrs. Beil saw that the driver, who was still sitting behind the wheel, was a man. The ranger asked the Beils to leave the area and said they would be contacted later for their statements.

{¶ 12} Frank Tomaino, a park officer with the Ohio Department of Natural Resources, testified that he had responded to the dispatch report of an erratic driver who was then in the parking lot of Monty's Restaurant. As Officer Tomaino pulled into the parking lot, he observed the described vehicle, which was still running, and pulled in behind it.

{¶ 13} Tomaino approached the car from the driver's side and saw appellant in the driver's seat with his head against the seat rest with his mouth open and eyes closed. The officer tried to wake him by pounding on the window. When appellant eventually awoke, he was incoherent. The officer yelled at him to unlock the door. Appellant could not find the electric door lock. He was fumbling with the controls on the door panel and had the back window going up and down. When the window was down, the officer smelled a strong odor of alcoholic beverage coming from inside the car.

{¶ 14} Appellant turned around and unlocked the back door. Tomaino opened the back door, reached in and unlocked the front door, opened that door, shut off the car, pulled the keys out of the ignition, and pulled appellant out of the car. Appellant's speech was slurred. He was unable to respond to the officer's questions or to produce his driver's license. He could not stand on his own and was leaning against the car.

{¶ 15} Ron Carr, deputy with the Trumbull County Sheriff's Department, testified that when he arrived at the scene, Tomaino gave him the keys to appellant's vehicle and told him that he had found appellant passed out behind the wheel.

{¶ 16} Deputy Carr testified that the driver was again sleeping in his vehicle. When asked to exit, appellant stepped out of his car and started to fall. Deputy Michael Davis caught him and held him up because appellant could not stand on his own. While Carr was talking to appellant, he smelled a strong odor of alcohol on him. Appellant slurred his speech, was swaying, and could not keep his balance.

{¶ 17} Carr said that due to appellant's level of intoxication, he could not stand on his own. As a result, the deputies did not administer any field sobriety tests on him. Appellant was arrested for OVI. He was handcuffed, searched, and placed into Davis's cruiser. Davis then transported appellant to the Sheriff (Sheriff) Department's substation located in the Mecca Township Fire Department.

{¶ 18} Carr testified that he remained on the scene and inventoried appellant's car. He found eight cans of beer strewn throughout the interior. Some of the cans were empty, two were unopened, and one near the center console was open and half full.

{¶ 19} Carr then drove to the sheriff's substation in Mecca. He removed appellant's handcuffs and brought him into the office. The officer watched appellant to make sure he did not put anything in his mouth, which he did not.

{¶ 20} Carr handed appellant BMV form 2255 and read it to him. The form advised appellant that he was under arrest for OVI and of the consequences of refusing to take the blood-alcohol-content ("BAC") test. Appellant read along with Carr, said he understood the provisions of the form, agreed to take the test, and signed the form. Brooke Sexton, a state trooper with the Ohio State Highway Patrol, then arrived to administer the breathalyzer test to appellant.

{¶ 21} Davis testified that when he responded to the dispatch, he saw the blue Corsica in the parking lot with a male sitting in the driver's seat, apparently asleep. He woke appellant and asked him to step out of his vehicle. In doing as asked, appellant fell forward, and Davis caught him. The deputy noticed a strong odor of alcohol coming from appellant. The deputies did not attempt to administer field sobriety tests, because appellant could not stand and would likely have been injured due to his "severe" intoxication. Carr placed appellant in custody by handcuffing him and putting him in the back of Davis's cruiser. Davis then transported appellant to the sheriff's substation.

{¶ 22} Davis testified that in 2006, appellant was convicted of a felony OVI. Further, between 1990 and 2004, he was convicted of nine other OVI offenses.

{¶ 23} State Trooper Sexton testified that she is certified as a senior operator of the BAC DataMaster. She said that on January 31, 2010, she was asked to perform a breathalyzer test on appellant at the Mecca fire station.

{¶ 24} Sexton testified that appellant was observed for more than 20 minutes prior to testing, to prevent oral intake of any material. The observation was performed by her and sheriff's deputies, and began when appellant was handcuffed at the scene.

{¶ 25} Sexton testified that although Carr had already read to appellant BMV form 2255, she also explained to him the consequences of a refusal to take the test. She then asked appellant if he would take the test, and he said, "I'll take your test. I did it. I'm guilty so I'll take it." Sexton asked him to stand to take the test, but he began to fall and caught himself on the wall. At that time, the trooper detected a strong odor of alcoholic beverage on appellant and saw that he also had glassy eyes.

{¶ 26} Sexton administered the BAC DataMaster test to appellant. His test indicated a blood-alcohol concentration of .286, more than three times the legal limit.

{¶ 27} After the state rested its case, appellant called his girlfriend, Karen Cross, to testify on his behalf. She said that appellant was driving her car when he was arrested, but that she had not known that he had taken her car. Cross said that she had been out with appellant the night before the incident and he was drinking alcohol. She said that appellant has high blood pressure, suggesting that this might have caused him to fall asleep in her car on January 31, 2010. However, she conceded his alleged high blood pressure would not have caused him to have a breathalyzer test result of .286, nor would it have caused him to drink and drive.

{¶ 28} The case was submitted to the jury, which returned a verdict finding appellant guilty of OVI on both counts of the indictment, each with a prior felony OVI conviction. The jury also found appellant guilty of the repeat-OVI-offender specification attached to each count.

{¶ 29} At appellant's sentencing hearing, the trial court noted that appellant has been convicted of 15 OVI offenses, including the instant case, and that he has been convicted of 31 moving violations. The court also noted that appellant had previously been convicted of vehicular homicide of a young girl on a hay ride as a result of driving while intoxicated. Although his driver's license has been suspended for the last 28 years, appellant has repeatedly driven vehicles while under suspension. The court noted that appellant has demonstrated a pattern of alcohol abuse, which he refuses to acknowledge or treat, and that he has shown no genuine remorse. The court noted that appellant has two prior domestic-violence convictions, one of which is for breaking his then live-in girlfriend's wrist and ankle. The court noted that appellant is habitually unemployed, although he always has enough money to drink to excess. There is an outstanding warrant for his arrest due to a $23,000 arrearage in child support. The court noted that

appellant is a danger to the community at large and specifically to all motorists. The court sentenced appellant on both counts to five years in prison and to five years on the repeat-OVI-offender specification, the two terms to be served consecutively. The court then merged both counts and specifications, for a total of ten years in prison. The court also revoked and permanently suspended appellant's driver's license.

{¶ 30} Appellant appeals the trial court's rulings on his pretrial motions and his conviction, asserting seven assignments of error. For his first assigned error, he alleges:

{¶ 31} "The trial court erred by denying the appellant's motion to suppress the results of the BAC DataMaster test where the operation of the DataMaster was in substantial violation of its prescribed instructions."

{¶ 32} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 98. The appellate court must accept the trial court's factual findings, provided they are supported by competent, credible evidence. Id., citing *State v. Fanning* (1982), 1 Ohio St.3d 19, 1 OBR 57, 437 N.E.2d 583. Thereafter, the appellate court must determine, without deference to the trial court, whether the applicable legal standard has been met. *Bainbridge v. Kaseda*, 11th Dist. No. 2007–G–2797, 2008-Ohio-2136, 2008 WL 1934491, at ¶ 20. Thus, we review the trial court's application of the law to the facts de novo. *State v. McNamara* (1997), 124 Ohio App.3d 706, 710, 707 N.E.2d 539.

{¶ 33} "Courts apply a burden-shifting procedure to govern the admissibility of breathalyzer test results. The defendant must first challenge the validity of the test by pretrial motion to suppress. *Burnside* [at ¶ 24]. After a defendant challenges the validity of test results, the state has the burden to show the test was administered in substantial compliance with the regulations prescribed by the Director of Health. Id. Once the state satisfies this burden, the burden shifts to the defendant to demonstrate he was prejudiced by anything less than strict compliance. Id." *State v. Dierkes*, 11th Dist. No. 2008–P–0085, 2009-Ohio-2530, 2009 WL 1515012, at ¶ 38.

{¶ 34} Scott Dixon, investigator with the public defender's office, testified during the suppression hearing that on April 27, 2010, three months after appellant's arrest, he went to the sheriff's substation in Mecca to check on records of the BAC DataMaster. He saw that a small three-foot by two-foot, college-dorm-type refrigerator was plugged into the same outlet as the BAC DataMaster, which, he said, did not comply with its owner's manual. However, on cross-examination, Dixon conceded that he is not an expert with respect to this machine. At trial, Dixon testified he has never used a BAC DataMaster and has

no experience with the machine. He said that although the owner's manual does state that no "large appliances" should be plugged into the same outlet as the machine, he does not know what, if any, affect this small refrigerator plugged into the same outlet would have on the test.

{¶ 35} In its judgment denying appellant's motion to suppress, the trial court found that even though the owner's manual states that a dedicated outlet is preferred, it does not state the machine will work improperly if an outlet is shared. The court also found there was no evidence that the shared outlet resulted in an improper reading of appellant's blood-alcohol content. The court found that there was no evidence that sharing the outlet was prohibited by regulations of the Ohio Department of Health. Finally, the trial court found that appellant had failed to prove he was prejudiced by the shared outlet.

{¶ 36} Appellant argues that the trial court erred in denying his motion to suppress the results of his breathalyzer test because the DataMaster was plugged into an outlet that was also being used by a mini-refrigerator, which, he claims, did not comply with the machine's owner's manual. Appellant's argument is incorrect for several reasons.

{¶ 37} First, the breathalyzer test was administered to appellant on January 31, 2010, and Dixon did not visit the substation and see the shared outlet until April 27, 2010, three months after appellant's test. Although the trial court found that the BAC DataMaster "shared an outlet with the refrigerator," there is no evidence in the record that such was the case on January 31, 2010. Consequently, we are not bound by this finding of the trial court. *Burnside*. Since there is no evidence that the BAC DataMaster and the refrigerator shared the same outlet on January 31, 2010, appellant failed to demonstrate that the DataMaster was not used in compliance with its owner's manual at the time of his test.

{¶ 38} Second, even if there was evidence that the two devices shared the same outlet on January 31, 2010, the owner's manual does not prohibit the sharing of an outlet in the circumstances presented here. The manual provides: "A dedicated outlet is preferable, but not essential *providing there are no large appliances also on the same line*. Be sure no refrigerators, coffee makers, drinking fountains, air conditioners or the like are on the same line as your DataMaster." (Emphasis sic.)

{¶ 39} Thus, the owner's manual provided that a dedicated outlet is preferred, but not necessary, unless a large appliance shares the outlet. Dixon testified that the refrigerator sharing the outlet was a small three-foot by two-foot, college-dorm-type refrigerator, and he conceded that it was not a large appliance. Consequently, according to the owner's manual, a dedicated outlet for the DataMaster was not essential.

{¶ 40} Third, even if appellant had demonstrated that sharing an outlet with the mini-refrigerator was not recommended by the DataMaster's owner's manual, appellant failed to demonstrate that sharing an outlet violated any regulation of the Health Department. As noted above, once the defendant alleges a violation of Health Department regulations, the state is required to show substantial compliance with those *regulations, Dierkes,* 2009-Ohio-2530, 2009 WL 1515012, not with an owner's manual. Since appellant never alleged a violation of Health Department regulations, the burden never shifted to the state to show that the test was administered in substantial compliance with those regulations.

{¶ 41} In any event, Robert Ross, Trumbull County Sheriff's Deputy, testified during the suppression hearing on the issue of substantial compliance. He is certified as a senior operator of the subject BAC DataMaster and is in charge of the instrument-calibration checks of the DataMaster, which, he said, he performs once every seven days, as required by the Department of Health. He said that prior to appellant's test on January 31, 2010, he performed an instrument check on January 26, 2010, and the BAC DataMaster was functioning properly. He also performed an instrument check on February 2, 2010, and the machine was operating correctly.

{¶ 42} Fourth, even if appellant demonstrated a violation of the Health Department regulations and the state proved substantial compliance with those regulations, appellant failed to demonstrate prejudice as a result of a violation of these regulations. We note that John Fusco, a principal in the firm that manufactures the BAC DataMaster, testified at trial that if a large or small appliance was plugged into the same outlet as the BAC DataMaster, *it would not cause an erroneous test result,* because if the appliance caused a temporary drop in voltage, the DataMaster would simply reset; it would not register a test result. We further note that appellant did not dispute Fusco's trial testimony. Moreover, appellant presented no evidence that the shared outlet resulted in an incorrect test result.

{¶ 43} We therefore hold that the trial court did not err in denying appellant's motion to suppress.

{¶ 44} Appellant's first assignment of error is overruled.

{¶ 45} Because appellant's second and third assigned errors are interrelated, we will consider them together. They allege:

{¶ 46} "[2.] The trial court erred by denying the appellant's motion to suppress his alleged statement.

{¶ 47} "[3.] The trial court committed plain error by not excluding testimony that appellant allegedly admitted some sort of guilt."

{¶ 48} As noted above, when Trooper Sexton asked appellant if he was willing to take the breathalyzer test, he responded, "I'll take your test. I did it. I'm guilty so I'll take it." Appellant argues that the court erred in denying his motion to suppress his statement to Sexton because he was not given *Miranda* warnings.

{¶ 49} In denying appellant's motion, the trial court found:

{¶ 50} "Under the circumstances of the present case, the Court does not find a Miranda warning was required in relation to the questions prior to the administration of the breathalyzer test. First, the questions were akin to routine administrative queries specifically tailored to the test itself. Trooper Sexton testified she communicated with the Defendant only in relation to the administration of the breathalyzer test and its consequences. Trooper Sexton explained she is required to provide this preamble to every person prior to administering the test. Following the explanation of the test, Trooper Sexton asked the Defendant if he wanted to take the test. She stated it is necessary to ask this question in order to insure the Defendant is voluntarily submitting to the test. It was in response to this question, whether the Defendant would voluntarily take the test, that the Defendant replied in the affirmative and expounded further, 'I'm guilty.'

{¶ 51} "The rationale behind the requirement for Miranda warnings prior to custodial interrogation is to avoid the use of improper intimidation tactics to elicit an inaccurate response. *Miranda* [*v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694]. There was nothing intimidating about Trooper Sexton's discussion with the Defendant. The conversation was strictly related to the breathalyzer test, the consequences of taking or not taking the test, and the voluntary option of the Defendant to submit to the test. The question posed to the Defendant only required a simple yes or no answer. This query was not reasonably likely to elicit an incriminating statement by the Defendant. The Defendant chose to expound with a voluntary utterance outside the scope of a custodial interrogation and therefore, the statement is not subject to suppression."

{¶ 52} As a preliminary matter, we do not agree with the state's contention that because appellant labeled his motion as a motion in limine, rather than a motion to suppress, he was required to object to the introduction of his statement at trial in order to preserve the error for appeal. While we are mindful of the Supreme Court of Ohio's holding in *State v. Hill* (1996), 75 Ohio St.3d 195, 202–203, 661 N.E.2d 1068, that the denial of a motion in limine does not preserve a claimed error for review in the absence of an objection at trial, the motion in limine in *Hill* sought to limit the prosecution's argument; it did not seek to exclude evidence allegedly obtained in violation of the defendant's constitutional rights. Appellant stated in his motion that he sought "to prohibit the State from

introducing any evidence of the Defendant's statements made prior to him being advised of his rights." He therefore clearly sought the suppression of evidence, rather than a pretrial ruling on an evidentiary issue. The trial court understood this to be the case because, in its judgment ruling on the motion, the court referred to appellant's motion as a "motion in limine to suppress the statements made by the Defendant." Thus, although appellant inartfully titled his motion as a motion in limine, in effect, appellant's motion was a motion to suppress and shall be treated as such. "The determination of whether a motion is a 'motion to suppress' or a 'motion in limine' does not depend on what it is labeled. It depends on the type of relief it seeks to obtain." *State v. Davidson* (1985), 17 Ohio St.3d 132, 135, 17 OBR 277, 477 N.E.2d 1141.

{¶ 53} Turning now to the merits of appellant's argument, this court's holding in *State v. McCauley*, 11th Dist. No. 2010–T–0015, 2010-Ohio-6446, 2010 WL 5550233, discretionary appeal not allowed at 128 Ohio St.3d 1461, 2011-Ohio-1829, 945 N.E.2d 524, is controlling. In *McCauley*, this court held that when a police officer asks a defendant, following his arrest for OVI, if he would submit to a breathalyzer test and the defendant volunteers that he is intoxicated, the officer's question does not amount to custodial interrogation and the defendant is not entitled to *Miranda* warnings before responding. Id. at ¶ 19–26.

{¶ 54} Applying these principles to the instant case, Trooper Sexton did not ask appellant if he had been drinking, how much he had had to drink, when he consumed his last alcoholic beverage, whether he was drunk, or whether he was guilty of the charge. She simply explained to him the consequences of a refusal to take the test and then asked him if he wanted to take the test. She said this is a procedural question that she is required to ask defendants arrested for OVI because they have a choice whether or not to take the test.

{¶ 55} As in *McCauley*, 2010-Ohio-6446, 2010 WL 5550233, while appellant was in custody, Sexton's question about taking the breath test was not designed to elicit an incriminating response. Appellant gave a nonresponsive answer to the trooper's question and thus volunteered information that was not requested. In these circumstances, appellant was not subject to custodial interrogation, and he was therefore not entitled to the *Miranda* warnings before giving his unsolicited response. We do not agree with appellant's contention, which is unsupported by reference to any authority, that because the trooper explained to appellant the consequences of a refusal to take the test, this turned the exchange into a custodial interrogation. We therefore hold that the trial court did not err in denying appellant's motion in limine to suppress his statement to Sexton.

{¶ 56} Appellant's second and third assignments of error are overruled.

{¶ 57} Appellant alleges the following as his fourth assigned error:

{¶ 58} "The trial court erred by admitting the 911 recording, over objection, in violation of appellant's right to confront the witnesses against him, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution."

{¶ 59} Appellant argues that the trial court erred in finding Mr. Beil to be unavailable to testify at trial, in admitting the recording of Mr. Beil's 9-1-1 call, and in denying his request for an order to compel Mr. Beil to submit to a deposition. He claims these rulings violated his right to confront witnesses against him. We do not agree.

{¶ 60} We review the admission or exclusion of evidence under an abuse-of-discretion standard. *State v. Finnerty* (1989), 45 Ohio St.3d 104, 107, 543 N.E.2d 1233. This court has recently stated that the term "abuse of discretion" is one of art, connoting judgment exercised by a court that does not comport with reason or the record. *State v. Hendrex*, 11th Dist. No. 2010-T-0103, 2011-Ohio-1588, 2011 WL 1225608, at ¶ 28.

{¶ 61} During a pretrial hearing on October 22, 2010, three days before trial, the prosecutor advised the court and counsel that Mr. Beil, who was then 73 years old, had recently been seriously injured in a fall from a ladder while cutting a tree branch. He broke his tibia, fibula, and pelvis. He was treated at Trumbull Memorial Hospital, Hillside Hospital, and the Cleveland Clinic. A bone-straightening device had been attached to both sides of his leg. Screws were placed through the bone, wire, and a metal frame apparatus. The prosecutor reported that it was difficult and painful for Mr. Beil to move, and he could not sit or lie flat for any length of time. The prosecutor said that he had previously offered to have Mr. Beil picked up by ambulance for his trial testimony and he had agreed. However, the prosecutor said that when he called Mr. Beil on October 22, 2010, he said he was not able to come to court to testify. He said he had had an emergency colonoscopy and was having issues with bowel movements. The prosecutor said he asked Mr. Beil if he would give a deposition in his home, but Mr. Beil said he would not agree to a deposition, because he did not want appellant to know where he lived.

{¶ 62} The trial judge asked the prosecutor to ask Mr. Beil again if he would consent to a deposition. The judge said that if Mr. Beil would not agree, the court would declare him to be unavailable, and the court would then hold a hearing regarding whether the recording of Mr. Beil's 9-1-1 call would be admissible at trial. On the day of trial, October 25, 2010, the prosecutor advised the court and counsel that Mr. Beil would not consent to a deposition. Following a hearing, the court found Mr. Beil to be unavailable pursuant to Evid.R. 804(A)(4) due to serious injury. The court also found the recording was admissible pursuant to *Davis v. Washington* (2006), 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 63} First, appellant argues that the trial court erred in finding that Mr. Beil was unavailable to testify at trial because Mr. Beil had previously agreed to testify but then changed his mind. However, the record is clear that Mr. Beil refused to testify due to his physical condition. Based on the undisputed representations of the prosecutor regarding Mr. Beil's condition, as confirmed by Mrs. Beil during her trial testimony, the trial court did not abuse its discretion in finding that Mr. Beil was unavailable.

{¶ 64} Moreover, in *Davis*, the United States Supreme Court held that the Confrontation Clause of the Sixth Amendment bars the admission only of *testimonial statements* of a witness who did not appear at trial. Id. at 821, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court held that statements are nontestimonial, and therefore not subject to exclusion, when they are made to enable police to meet an ongoing emergency. Id. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224. In contrast, statements are testimonial when there is no ongoing emergency and they are made to prove past events relevant to later criminal prosecution. Id.

{¶ 65} Here, Mr. Beil contemporaneously reported to 9–1–1 that appellant was driving erratically, crossed the center line, and almost hit two vehicles driving in the opposite direction. Mr. Beil and his wife were driving behind appellant and were therefore exposed to his reckless and dangerous driving. Mr. Beil provided this information to allow police to address an ongoing emergency. Thus, the trial court did not abuse its discretion in finding the recording of Mr. Beil's 9–1–1 call to be admissible pursuant to *Davis*.

{¶ 66} We further note that the recording would also have been admissible as a present-sense impression. Evid.R. 803, "Hearsay exceptions; availability of declarant immaterial," provides:

{¶ 67} "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

{¶ 68} "(1) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness."

{¶ 69} Here, during his 9–1–1 call, Mr. Beil described appellant's reckless driving as he was perceiving it. It was therefore a present-sense impression. Ohio courts have held that "911 calls are generally admissible as excited utterances or present sense impressions." *State v. Johnson*, 10th Dist. No. 08AP–652, 2009-Ohio-3383, 2009 WL 2003398, at ¶ 22.

{¶ 70} In any event, even if the recording of Mr. Beil's 9–1–1 call were not admissible, Mrs. Beil's trial testimony was basically the same as Mr. Beil's 9–1–1

call, and therefore any error resulting from the admission of the recording would have been harmless beyond a reasonable doubt.

{¶ 71} Finally, we do not agree with appellant's argument that the trial court erred in denying his request to take Mr. Beil's deposition. This court has held: "The general rule in Ohio is that a defendant has no right to interview, depose or examine a state's witness prior to trial without the consent of the witness, as long as the prosecution has not unduly interfered with the free choice of the witness." *State v. Dietz* (July 29, 1988), 11th Dist. No. 12–192, 1988 WL 81337, citing *State v. Zeh* (1987), 31 Ohio St.3d 99, 31 OBR 263, 509 N.E.2d 414. Here, there is no evidence, and appellant does not argue, that the prosecutor had anything to do with Mr. Beil's decision not to be deposed by appellant. In fact, appellant concedes that Mr. Beil refused to submit to deposition.

{¶ 72} Appellant's fourth assignment of error is overruled.

{¶ 73} For his fifth assigned error, appellant maintains:

{¶ 74} "The trial court abused its discretion by denying appellant's motion for a mistrial."

{¶ 75} Appellant argues that the trial court abused its discretion by denying his request for a mistrial due to alleged discrepancies between the recording of Mr. Beil's 9–1–1 call and the transcript of the call that was published to the jury as a listening aid. Again, we do not agree.

{¶ 76} As a preliminary matter, we note that appellant advanced a different theory in the trial court in support of his request for a mistrial from that which he raises on appeal. He moved for a mistrial below claiming that the trial court distributed to the jury the transcript of the 9–1–1 call before defense counsel saw it. Now, for the first time on appeal, appellant argues that the trial court should have granted a mistrial because the transcript did not correctly represent the recording of the 9–1–1 call.

{¶ 77} It is well settled that where a party proceeds in trial on a certain legal theory, he may not abandon that theory on appeal and proceed on a different theory in the appellate court. *Dolan v. Dolan*, 11th Dist. Nos. 2000–T–0154 and 2001–T–0003, 2002-Ohio-2440, 2002 WL 1012575, at ¶ 7 ("a party cannot raise any new issues or legal theories for the first time on appeal"). Because appellant did not argue below that the transcript was inaccurate, the trial court was not given an opportunity to consider this argument and to correct any resulting error. Appellant therefore failed to preserve this argument for appeal.

{¶ 78} However, even if the issue was properly before us, it would lack merit. This court has held that "[t]he decision to grant a mistrial rests in the sound discretion of the trial court." *State v. Gross*, 11th Dist. No. 2004–A–0036, 2005-

Ohio-5765, 2005 WL 2841601, at ¶ 29. "We will reverse the trial court's decision only if it has abused its discretion." Id.

{¶ 79} In *State v. Smith*, 11th Dist. No. 2003–T–0031, 2005-Ohio-139, 2005 WL 89388, this court held that the trial court has a duty to ensure that a transcript being published to the jury is "an accurate representation of the subject matter of the tape." Id. at ¶ 14. In *Smith*, this court held that because the trial court did not review the transcript to ensure its accuracy, the trial court abused its discretion. However, in finding the error to be harmless, this court stated:

{¶ 80} "The Supreme Court of Ohio has held, 'where there are no "material differences" between a tape admitted into evidence and a transcript given to the jury as a listening aid, there is no prejudicial error.' (Citations omitted.) *State v. Waddy* (1992), 63 Ohio St.3d [424], 445 [588 N.E.2d 819]. On appeal, Smith claims the transcripts are inaccurate. But, Smith does not point to any specific instance of inaccuracy. We have listened to the audiotape and agree that it is of poor quality. However, when comparing the audiotape to the transcript, we are unable to note any material differences between the two." *Smith* at ¶ 16.

{¶ 81} Turning to the facts of the instant case, while the quality of the audio recording is poor, the trial court stated on the record that it had reviewed the transcript and found that the transcript was "a correct reflection of exactly what was on the tape." Moreover, appellant has failed to cite even one example of a conflict, let alone a material difference, between the recording, and the transcript. In addition, we have reviewed the transcript and the audio recording and do not discern any material differences between the two. For these reasons, we hold that the trial court did not abuse its discretion in denying appellant's motion for a mistrial.

{¶ 82} Appellant's fifth assignment of error is overruled.

{¶ 83} For his sixth assigned error, appellant alleges:

{¶ 84} "The trial court abused its discretion by excluding evidence concerning the calibration of the BAC DataMaster."

{¶ 85} Appellant argues that the trial court abused its discretion by denying his request to admit at trial a 77–page manual entitled "Bureau of Alcohol and Drug Testing Renewal BAC DataMaster," dated January 2009, that his investigator Scott Dixon had downloaded from the Internet. The manual was apparently prepared to assist operators seeking renewal of their certification on the DataMaster. It included excerpts from the Ohio Revised Code and the Ohio Administrative Code; extensive, highly technical information about the DataMaster; and sample test questions to be given to operators. Appellant concedes that the manual was not authenticated. For this reason alone, it was not admissible and, therefore, the trial court did not err in denying appellant's request.

{¶ 86} Appellant also argues that the trial court abused its discretion in sustaining the state's objection to Dixon's trial testimony that (1) on one occasion in 2009, the DataMaster was not checked for 19 days (such machines are generally required to be checked once every seven days), (2) in December 2008, it had "no solution," and (3) it had a printer-ribbon problem in May 2009.

{¶ 87} We agree with the trial court's finding that these previous incidents were irrelevant to whether the BAC DataMaster was operating properly when appellant was tested on January 31, 2010. In *State v. Vega* (1984), 12 Ohio St.3d 185, 12 OBR 251, 465 N.E.2d 1303, the Supreme Court of Ohio held that because the legislature has delegated to the Director of the Ohio Department of Health, rather than the courts, the discretionary authority to determine which tests and procedures are reliable and thus admissible in an OVI prosecution, "an accused may not make a general attack upon the reliability and validity of the breath testing instrument." Id. at 190, 12 OBR 251, 465 N.E.2d 1303.

{¶ 88} In *State v. Massie*, 2d Dist. No. 2007 CA 24, 2008-Ohio-1312, 2008 WL 754804, the defendant argued that the trial court had improperly failed to consider evidence during a suppression hearing that the BAC DataMaster used to test him had malfunctioned earlier in the day when another officer administered a BAC test to another defendant. The Second District held:

{¶ 89} "Massie sought to make a general attack, by means of the test results of another defendant, whose test was administered by another officer, upon the reliability of his own test results, not upon the reliability of his specific testing procedure or the qualifications of the operator, as *Vega* allows. Massie's attack is forestalled by the 'legislative mandate recognized in *Vega*,' and the trial court properly limited the defendant to the issue of his own test." *Massie* at ¶ 36.

{¶ 90} Appellant challenges the trial court's refusal to allow him to present evidence at trial regarding prior alleged malfunctions of the BAC DataMaster. We recognize that the Supreme Court of Ohio has held that "[e]videntiary objections challenging the competency, admissibility, relevancy, authenticity, and credibility of the chemical test results" may be raised at trial. *State v. French* (1995), 72 Ohio St.3d 446, 452, 650 N.E.2d 887. However, in light of *Vega*, 12 Ohio St.3d 185, 12 OBR 251, 465 N.E.2d 1303, Ohio appellate districts have "declined to interpret *French* as departing from *Vega* and allowing a challenge to the general reliability of breathalyzers." *State v. Casner*, 10th Dist. No. 10AP–489, 2011-Ohio-1190, 2011 WL 882638, at ¶ 12. Accord, *Columbus v. Aleshire*, 187 Ohio App.3d 660, 673, 2010-Ohio-2773, 933 N.E.2d 317 (noting that *French* "does not indicate that a challenge to the 'general reliability' [of breathalyzers] is among the permissible challenges" at trial).

{¶ 91} Here, appellant did not present any evidence at trial challenging the reliability of his testing procedure or Trooper Sexton's qualifications. Instead,

his attack was general in nature because it was based on prior alleged malfunctions that had nothing to do with his test. *Massie.* As a result, the trial court did not abuse its discretion in refusing to allow appellant to attack the general reliability of the BAC DataMaster at trial, in contravention of *Vega.* See *Aleshire.* This is particularly true in light of Dixon's admitted lack of knowledge of the BAC DataMaster. Id.; *Vega.* He testified that he has never used a BAC DataMaster, he is not certified in its use, he is not an expert in it, and he is not familiar with its mechanics.

{¶ 92} Appellant's sixth assignment of error is overruled.

{¶ 93} For his seventh and final assignment of error, appellant alleges:

{¶ 94} "The appellant's convictions are against the manifest weight of the evidence."

{¶ 95} A court reviewing the manifest weight of the evidence observes the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Schlee* (Dec. 23, 1994), 11th Dist. No. 93–L–082, 1994 WL 738452, *14–*15. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. An appellate court must defer to the factual findings of the jury regarding the weight to be given to the evidence and credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 96} First, appellant argues that when a pick-up truck passed by his car in Monty's parking lot, there was a period of time when the Beils could not see appellant's vehicle, so another person could possibly have gotten into or left appellant's car. Mr. Beil told the 9–1–1 dispatcher: "There is a car next to her, a pick-up truck that's moving out, then, I'll be able to see her." While Mr. Beil did not estimate the time appellant was out of his view, putting this comment in context, it appears to have been momentary. Moreover, Mrs. Beil testified that when the truck was leaving, it was only a matter of seconds that they could not see appellant. She said she could see appellant virtually the entire time he was in the parking lot, and no one else was in his car. Consequently, appellant's suggestion that someone else may have been the driver is not supported by the evidence and is mere conjecture.

{¶ 97} Next, appellant argues that because he has high blood pressure, this could explain why he blacked out. It does not, however, explain the testimony of

two experienced officers that appellant was intoxicated, the testimony of four experienced officers that a strong odor of alcohol emanated from him, the evidence that he was surrounded by both opened and unopened beer cans in his car, his high breathalyzer result, or his admission that he was guilty of OVI.

{¶ 98} Next, appellant argues that although the BAC DataMaster evidence ticket shows that Trooper Sexton signed it at 1:40 p.m., she could not have started the test at that time, because she did not leave her home until 1:41 p.m. She testified that the logs showed she arrived at the Mecca substation at 1:51 p.m. Since she administered the test at 2:04 p.m., she personally observed appellant for 13 minutes prior to the test. She testified, however, that the observation of other officers can be added to hers in determining the total observation time and that appellant was continuously observed by her and the arresting deputies for over 20 minutes prior to his test.

{¶ 99} It is well settled that the observation of other officers can be included with the observation of the instrument operator in calculating the required 20–minute observation period. This court has held that when two or more officers observe a defendant continuously for 20 minutes or more prior to the administration of a breath-alcohol test, the observation requirement has been satisfied. *Dierkes*, 2009-Ohio-2530, 2009 WL 1515012, at ¶ 40, citing *Bolivar v. Dick* (1996), 76 Ohio St.3d 216, 667 N.E.2d 18. We note that in *Bolivar*, the observation began prior to arrival at the police station. The Supreme Court in *Bolivar* also noted that the focus of the mandatory observation period is " 'to prevent oral intake of any material.' " Id. at 218, 667 N.E.2d 18, citing *State v. Steele* (1977), 52 Ohio St.2d 187, 6 O.O.3d 418, 370 N.E.2d 740. Trooper Sexton testified that the observation period began when appellant was arrested and that he was observed for more than 20 minutes before testing.

{¶ 100} Finally, appellant argues that because the DataMaster shared an outlet with the mini-refrigerator, his conviction was against the manifest weight of the evidence. However, as discussed above, in the circumstances of this case, the shared outlet did not deviate from the recommendation in the owner's manual, and, in any event, appellant has failed to demonstrate that this practice is prohibited by any regulation of the Health Department. Moreover, the state presented *undisputed* evidence from the machine's manufacturer that while a shared outlet might cause the machine to reset, it could never result in an incorrect test result. Finally, appellant presented no evidence that the shared outlet resulted in an incorrect test result.

{¶ 101} In weighing the evidence, the jury obviously found the state's witnesses to be more credible than those presented by appellant. After reviewing the record, we cannot conclude that the trier of fact lost its way and created such a

manifest miscarriage of justice that appellant is entitled to a reversal of his conviction.

{¶ 102} There was sufficient, credible evidence to support the jury's verdict.

{¶ 103} Appellant's seventh assignment of error is overruled.

{¶ 104} For the reasons stated in the opinion of this court, appellant's assignments of error lack merit. It is the judgment and order of this court that the judgment of the Trumbull County Court of Common Pleas is affirmed.

Judgment affirmed.

CANNON, P.J., and WRIGHT, J., concur.