[Cite as *State v. Carr*, 2013-Ohio-737.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2012-L-001** |
| MICHAEL P. CARR, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal from the Lake County Court of Common Pleas, Case No. 11CR000109.

Judgment: Affirmed.


*Charles E. Coulson*, Lake County Prosecutor, *Teri R. Daniel*, Assistant Prosecutor, and *Patrick J.* Condon, Assistant Prosecutor, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Michael J. O'Shea*, 19300 Detroit Road, Suite 202, Rocky River, OH 44116. (For Defendant-Appellant).


DIANE V. GRENDELL, J.

{¶1} Defendant-appellant, Michael P. Carr, appeals from the Judgment Entries of the Lake County Court of Common Pleas, denying his Motion to Suppress and finding him guilty of two counts of Aggravated Vehicular Assault, one count of Vehicular Assault, two counts of Operating a Vehicle Under the Influence of Alcohol (OVI), and one count of Driving Under Suspension (DUS). The issues to be determined by this court are whether an OVI suspect's blood can be drawn without his consent; whether an

evidentiary blood sample can be drawn when a defendant is not under arrest; whether a conviction for OVI is supported by the weight and sufficiency of the evidence when there was evidence that a defendant was driving erratically, exhibited signs of intoxication, and his blood alcohol concentration was .202; and whether actual notice of suspension is required to be convicted of DUS. For the following reasons, we affirm the decision of the court below.

{¶2} On May 27, 2011, Carr was indicted by the Lake County Grand Jury for the following: Aggravated Vehicular Assault (Count One), a felony of the second degree, in violation of R.C. 2903.08(A)(1); Aggravated Vehicular Assault (Count Two), a felony of the second degree, in violation of R.C. 2903.08(A)(1); Vehicular Assault (Count Three), a felony of the third degree, in violation of R.C. 2903.08(A)(2); Operating a Vehicle Under the Influence of Alcohol (Count Four), a misdemeanor of the first degree, in violation of R.C. 4511.19(A)(1)(a); Operating a Vehicle Under the Influence of Alcohol (Count Five), a misdemeanor of the first degree, in violation of R.C. 4511.19(A)(1)(f); Driving Under Suspension (Count Six), a misdemeanor of the first degree, in violation of R.C. 4510.11(A); Reckless Operation (Count Seven), a minor misdemeanor, in violation of R.C. 4511.20(A); Operating a Vehicle Without Reasonable Control (Count Eight), a minor misdemeanor, in violation of R.C. 4511.202(A); and Failure to Maintain Assured Clear Distance (Count Nine), a minor misdemeanor, in violation of R.C. 4511.21(A).

{¶3} On August 9, 2011, Carr filed a Motion to Suppress the evidence of a blood draw test conducted to determine his blood alcohol concentration (BAC). Carr asserted that the evidence should be suppressed because he was not under arrest at

the time of the blood draw, he did not consent to the blood draw, and certain Ohio Administrative Code procedures were not followed in drawing and testing his blood.

{¶4} On September 23, 2011, a suppression hearing was held. The following testimony was presented at that hearing.

{¶5} Officer Matthew Neath, a patrolman for the Willoughby Hills Police Department, testified that on February 9, 2011, he was dispatched to the scene of a car accident on Interstate 271 North in Willoughby Hills, Ohio. Upon his arrival at the scene, he observed one vehicle on the left shoulder of the road, and saw another vehicle in a ditch off of the right shoulder. At the scene, he encountered Carr, the owner of the vehicle on the left shoulder of the road, who had blood coming down the side of his face. Upon inquiring what had occurred, Carr responded that he did not know what had happened. While speaking with Carr, Officer Neath noted that his speech was "very slurred" and he seemed "very confused." Carr was taken into an ambulance and inside, Officer Neath noticed that Carr had a "very strong odor of alcoholic beverage on his breath."

{¶6} Carr was transported to Hillcrest Hospital. After speaking with witnesses at the scene, Officer Neath went to the police department to retrieve a blood sample kit before going to the hospital because he had reason to believe Carr was under the influence of alcohol. Upon arriving at the hospital, Officer Neath had to wait to speak with Carr because the doctors were attending to him.

{¶7} Officer Neath then spoke to Hillcrest Hospital security, and made arrangements for security to watch Carr if he remained in the hospital until a Willoughby Hills officer could be sent to take him into custody. Subsequently, Officer Neath was

3

able to speak with Carr and read him his Miranda rights. Carr explained that he had one glass of wine and denied being in an accident. Officer Neath then read the BMV2255 ALS form to Carr, which stated that Carr was "under arrest" for operating a vehicle under the influence and explained that the refusal to take any required chemical tests would result in a suspension of Carr's driving privileges. Carr refused to submit to either a breath or blood test.

{¶8} Officer Neath left the room for a period of time, and then a doctor "came out and said that he did not believe that Mr. Carr was in the right frame of mind to refuse or consent at that time" and said that Carr was "not of sound mind." Officer Neath determined that "based off of rules of implied consent the hospital staff would be able to draw blood at that point." Blood was then drawn from Carr and Officer Neath transported the blood to the police department.

{¶9} Officer Neath explained that he did have the intention to arrest Carr on that night. He explained that he was unable to do field sobriety tests at the scene of the accident and that he did not do them at the hospital because the hospital staff was working on Carr. He also explained that he did not feel he could remove Carr from the hospital because he was told Carr was being admitted for the night.

{¶10} Nurse Nicole Berman, a registered nurse at Hillcrest Hospital, treated Carr on the night of the accident. She initially observed him acting appropriately at around 10 p.m. However, at 11:10 p.m., she made a note on the chart stating that "patient cannot remember things he just told me. * * * Dr. Marshall okayed blood draw as patient is not of sound reasoning." She explained that she drew Carr's blood, following the standard medical procedure, and she sealed the blood before giving it to the officer.

4

{¶11} Berman testified that according to the ambulance report, Carr did not have a loss of consciousness and was alert. She explained that he was not diagnosed as having any neurological problems or as having a concussion.

{¶12} Douglas Rohde, a supervisor of chemistry and toxicology at the Lake County Crime Lab, testified regarding the tests he performed on the forensic sample of Carr's blood. He explained that when he received this sample, there was no evidence of tampering and he took the sample from a sealed tube. Rohde explained that he tested Carr's whole blood sample using the gas chromatography method and the results indicated that Carr's BAC was .202.

{¶13} Rohde explained that alcohol begins to metabolize almost instantaneously once it has entered the body and that time is of the essence when collecting a blood sample in order to be able to obtain an accurate BAC.

{¶14} Dr. Brian Marshall, an emergency room doctor at Hillcrest Hospital, treated Carr on the night of the accident. He testified that Carr acted "agitated" when he was first admitted. Dr. Marshall explained that two separate blood draws were done on that night, one for medical tests and one evidentiary or forensic sample for the police.

{¶15} Dr. Marshall explained that Carr was found to have a "minor head injury." Dr. Marshall stated that he authorized a "medical" blood draw. However, he explained that he did not mean to authorize a sample taken for any other purpose.

{¶16} On October 7, 2011, the trial court issued a Judgment Entry, denying Carr's Motion to Suppress. The trial court found that, under *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), there was probable cause to take a blood sample without Carr's consent. The court also found that Carr had been under

arrest, since Officer Neath told Carr he was under arrest, intended to arrest Carr, and Carr was guarded at all times while in the hospital. The court found that Carr was deemed to have consented to a blood draw, pursuant to R.C. 4511.191(A), since he gave implied consent due to being incapable of refusing. The court also found that there was no violation of the Ohio Administrative Code in relation to the blood draw, the storing of the blood, or the blood testing performed by the Lake County Crime Lab.

{¶17} A trial to the court was held in this matter on October 17, 2011. Prior to the trial, the parties stipulated that the victim's injuries in the crash amounted to serious physical harm. The following testimony was presented.

{¶18} Rohde, the supervisor at the Lake County Crime Lab testified regarding his testing of Carr's blood. He presented testimony similar to that presented at the suppression hearing. He explained that, upon reviewing Carr's medical records, the hospital did a test of his blood and arrived at an alcohol serum number of .213. He performed certain conversions on the serum test to arrive at the BAC, which led to an approximate .180 result. He explained that conducting his own test of the separate sample provided by the police, he arrived at a result of a .202 concentration in the whole blood. He was unaware of exactly what Carr's blood alcohol content may have been at the time of the accident and stated that it could have been higher, lower, or the same.

{¶19} He explained that in his expert opinion, to a reasonable degree of scientific certainty, an individual's ability to operate a motor vehicle would be "appreciably impaired" based on the BAC of .202, since he would have a slower reaction time and difficulty performing "divided attention" tasks.

{¶20} Sharon Hazen testified as a witness to the accident that occurred on February 9, 2011. She explained that she was driving on 271 North and saw a gray or silver Volvo, later identified by police as Carr's vehicle, "flying behind us" and it "shook [her] car it was driving so fast." She saw the car collide with another car and saw the second car hit the guardrail, flip over, and fall into a ditch. She exited her car, approached the Volvo, and saw a man in the driver's seat, who had blood on his forehead. She did not see anyone else in the car and the man informed her no one was with him. She saw him get out of the car and start walking around, standing outside of his vehicle, and she asked him not to move because she thought he might have a head injury.

{¶21} Bernadette Stark also witnessed the incident on February 9. While driving on 271 North, she saw that a Volvo "went flying past [her] like a bullet." She testified that the vehicle was going "like over a hundred [mph] easily." She then saw the Volvo and another car collide and the second car flip over the guardrail.

{¶22} Audrey Kaczmarek, the victim in the accident, testified that while she was driving on 271 North, she heard an accelerating engine from behind and then was hit on the back left side of her car. Her car hit the guardrail and rolled over three times. She did not see the driver of the car that hit her.

{¶23} Brett Adam Wessler testified that on February 9, he witnessed a Volvo on 271 travelling at close to a hundred miles an hour. The car was rapidly and erratically shifting lanes and "hooking in the tail" like someone "yanking on the wheel too hard." Soon thereafter, Wessler saw that the same vehicle was in an accident.

{¶24} Berman, the Hillcrest Hospital nurse, presented similar testimony to her testimony at the suppression hearing. She explained further that she drew blood from Carr on the night of February 9, 2011, on two occasions, both for a medical use and for the police.

{¶25} Officer Neath also gave testimony consistent with the suppression hearing. In addition, he explained that on the night of the accident, the roads were dry and clear. He explained that, at the scene, he noticed Carr was talking with a "thick tongue."

{¶26} Officer Neath explained that while he was in the hospital with Carr and reading Carr his rights, Carr paid attention and seemed to understand what he was saying. Officer Neath explained that no investigation was done by going to the bar where Carr was drinking to determine how many drinks he had on the night of the accident.

{¶27} Darlene Jones, an employee at the Ohio Bureau of Motor Vehicles (BMV) in Youngstown, testified regarding Carr's driving record. She explained that according to Carr's certified driving record, he had a violator compact suspension on his license, starting on September 28, 2010, due to his failure to pay a ticket in the state of Indiana. She testified that a notice of suspension was mailed to Carr's address, dated September 1, 2010, stating that he was required to pay a $30 reinstatement fee to Ohio and provide a receipt for payment to the state of Indiana in order to prevent his license from being suspended. She explained that these requirements were not met, his license became suspended on September 28, 2010, and the suspension was not cleared until March 25, 2011.

{¶28} At the close of the State's case, Carr made a Crim.R. 29 Motion. This was denied by the trial court.

{¶29} Ray Carr, Carr's father, testified for the defense. He explained that he had been helping Carr with his financial affairs. Regarding Carr's suspended license, Ray sent a cashier's check to the Indiana court to pay Carr's fine. He did not get a receipt or a verification of this payment to submit to the Ohio BMV as required. He explained that he also sent a check to the Ohio BMV on September 24, 2010. After making these payments, he informed Carr that his license was no longer suspended. However, Ray explained that he later found out the license was still suspended, that Indiana had either not received or made a record of his payment, and thereafter sent another payment to Indiana.

{¶30} Ray explained that he had seen the September 1, 2010 notice of suspension, which prompted him to pay the Ohio BMV. He explained that he received the letter from Carr and that it was in a pile of documents related to various financial issues that Ray was helping Carr resolve.

{¶31} The State moved to dismiss counts seven through nine. These counts were dismissed.

{¶32} On October 17, 2011, the trial court found Carr guilty of counts one through six. This was memorialized in a Judgment Entry filed on October 20, 2011. On December 19, 2011, Carr was sentenced to a term of two years each for counts one through three, and for six months each on counts four through six. The trial court, for the purposes of sentencing, merged counts two and three with count one, and counts four and five with each other. The court also merged counts one and six, and Carr was

sentenced to a total term of two years in prison. He was also ordered to pay a $1,000 fine and his driver's license was suspended for a period of four years.

{¶33} Carr timely appeals and raises the following assignments of error:

{¶34} "[1.] The trial court erred by denying the motion to suppress concerning the evidentiary blood draw because (1) the defendant was not under arrest at the time of the blood draw and/or (2) the blood draw was conducted notwithstanding the defendant unambiguously refus[ing] consent to the blood draw and/or (3) defendant was not in a condition rendering him incapable of refusal and thus there was no implied consent.

{¶35} "[2.] There was insufficient evidence of an 'Under the Influence' violation of '4511.19(A)(1)(a)' because of the improper admission of the evidence blood draw, the conscious disregard of any field sobriety tests and the use of medical blood evidence that did not comply with the Ohio Administrative Code (or, in the alternative, the 4511.19(A)(1)(a) conviction is against the manifest weight of the evidence).

{¶36} "[3.] As it relates to the DUS count (and the DUS element of the other counts of the indictment), the State failed to show that the defendant had notice or knowledge of his suspension at the time of the arrest."

{¶37} In his first assignment of error, Carr argues that the trial court erred by denying his Motion to Suppress and by admitting the results of the evidentiary blood draw collected by the police at the hospital and submitted to the Lake County Crime Lab for testing. He asserts that since he was not under arrest at the time of the blood draw, he refused consent, and he was not incapable of denying consent, the blood was

improperly drawn and the results of the tests taken on that sample could not be admitted as evidence.

**{¶38}** The State argues that Carr was under arrest at the time of the blood draw and even if he was not, a blood draw was proper under *Schmerber* because there was probable cause to arrest Carr and exigent circumstances required to take a blood sample in the absence of consent.

**{¶39}** "The trial court acts as trier of fact at a suppression hearing and must weigh the evidence and judge the credibility of the witnesses." (Citations omitted.) *State v. Ferry*, 11th Dist. No. 2007-L-217, 2008-Ohio-2616, ¶ 11. "[T]he trial court is best able to decide facts and evaluate the credibility of witnesses." (Citation omitted.) *State v. Wagner*, 11th Dist. No. 2010-P-0014, 2011-Ohio-772, ¶ 12. "The court of appeals is bound to accept factual determinations of the trial court made during the suppression hearing so long as they are supported by competent and credible evidence." *State v. Hines*, 11th Dist. No. 2004-L-066, 2005-Ohio-4208, ¶ 14. "Once the appellate court accepts the trial court's factual determinations, the appellate court conducts a de novo review of the trial court's application of the law to these facts." (Citations omitted.) *Ferry* at ¶ 11.

**{¶40}** We initially note that the parties do not dispute that Carr refused to consent to a blood draw. The question before us, instead, is whether Carr's blood could be drawn for the purposes of testing without his consent.

**{¶41}** Carr argues that in order to draw his blood, he must have given consent, have committed prior OVIs allowing for a forcible blood draw, or the State was required

11

to obtain a search warrant. However, Carr fails to recognize that another basis for a proper blood draw exists under *Schmerber*.

**{¶42}** Pursuant to *Schmerber*, if there are exigent circumstances and "an officer has probable cause to arrest a driver for DUI, the result of an analysis of a blood sample taken over the driver's objection and without consent is admissible in evidence, even if no warrant had been obtained." *State v. Hoover*, 123 Ohio St.3d 418, 2009-Ohio-4993, 916 N.E.2d 1056, ¶ 19, citing *Schmerber*, 384 U.S. at 770-771, 86 S.Ct. 1826, 16 L.Ed.2d 908; *State v. Schulte*, 11th Dist. No. 94-L-186, 1996 Ohio App. LEXIS 4675, *22 (Oct. 25, 1996) ("a blood sample may be taken over a defendant's objection where there are exigent circumstances and probable cause").

**{¶43}** Under *Schmerber* and the law of this state, we must consider if there were exigent circumstances, probable cause to arrest Carr for OVI prior to the evidentiary blood draw, and a reasonable procedure used to extract the blood. *Schmerber* at 770-772; *State v. Capehart*, 12th Dist. No. CA2010-12-035, 2011-Ohio-2602, ¶ 10. If all of these elements are present, then Carr's consent was unnecessary for the blood draw results to be admissible.

**{¶44}** Regarding whether exigent circumstances are present in blood draw cases, this court has stated that "[i]t is beyond cavil that alcohol in an individual's system progressively dissipates over a short period of time.  * * *  This is why '[a]lcohol in body substances is [considered] evanescent evidence.'"  (Citations omitted.) *Willoughby v. Dunham*, 11th Dist. No. 2010-L-068, 2011-Ohio-2586, ¶ 37; *Schmerber* at 770 ("the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system").

**{¶45}** This court has held that the exigency exception is applicable to seize a defendant to prevent the evidence of his blood alcohol content from being lost. *Dunham* at ¶ 37. Exigent circumstances have also been found to justify ordering a blood sample without consent under *Schmerber* when a defendant was in an accident approximately two hours prior to the blood draw and "there was a risk that evidence would be destroyed as appellant's system began to eliminate the alcohol." *Schulte*, 1996 Ohio App. LEXIS 4675, at *23; *Schmerber* at 770-771 (in cases where the defendant had to be taken to a hospital and police had to investigate the scene of the accident, time is limited to secure a warrant and exigent circumstances exist).

**{¶46}** In the present case, police suspected that Carr was under the influence of alcohol after encountering him at the scene of the accident. Carr had to be transported to the hospital due to a potential injury while Officer Neath remained at the scene of the accident to continue his investigation and speak to witnesses. When Officer Neath arrived at the hospital, he had to wait for a period of time before being able to talk to Carr and determine that a blood draw was necessary, which occurred over an hour after the accident occurred. This is the type of case where there was both a risk that the evidence would be destroyed and there would be difficulty obtaining a warrant due to the surrounding circumstances, similar to those that existed in *Schmerber*, and we find that exigent circumstances existed.

**{¶47}** The next consideration is whether the trial court properly found that probable cause existed to arrest Carr for an OVI, such that a blood draw was proper under *Schmerber*. Probable cause is defined as "'a reasonable ground for belief of guilt.'" *State v. Moore*, 90 Ohio St.3d 47, 49, 734 N.E.2d 804 (2000), quoting *Carroll v.*

13

*United States*, 267 U.S. 132, 161, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Probable cause requires "more than bare suspicion: Probable cause exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), quoting *Carroll* at 162. A probable cause determination is based on the "totality" of facts and circumstances within a police officer's knowledge. *State v. Miller*, 117 Ohio App.3d 750, 761, 691 N.E.2d 703 (11th Dist.1997). The odor of alcohol, glassy eyes, slurred speech, and other indicia of alcohol use by a driver are factors to be considered in determining the existence of probable cause for an OVI arrest. *Kirtland Hills v. Deir*, 11th Dist. No. 2004-L-005, 2005-Ohio-1563, ¶ 16. Testimony regarding a defendant's erratic driving is also a factor to be considered. *State v. Sitko*, 11th Dist. No. 2011-P-0042, 2012-Ohio-2705, ¶ 28.

{¶48} In the present case, as found by the trial court, Officer Neath smelled the strong odor of alcohol on Carr's breath and stated that Carr had both slurred speech and "mush mouth." In addition, prior to taking the blood, Carr admitted that he had a glass of wine prior to the accident. Carr was also involved in an accident and several witnesses informed Officer Neath at the scene that Carr was driving 90 to 100 miles per hour and was "weaving aggressively in and out of traffic" prior to hitting the victim's car. According to Officer Neath's testimony, Carr also acted confused and did not remember being in an accident, even though he sustained an injury and vehicle damage.

14

**{¶49}** This court has found probable cause for an arrest in similar circumstances. In *State v. Hummel*, 154 Ohio App.3d 123, 2003-Ohio-4602, 796 N.E.2d 558 (11th Dist.), this court found that there was probable cause for an OVI arrest when there was evidence that an accident appeared to be caused by impaired control, there was a strong odor of alcohol on the defendant, and the defendant had slurred speech and glassy eyes. *Id.* at ¶ 34. The court noted that "[w]hen a police officer arrives at the scene of an accident, shortly after its occurrence, discerns an odor of alcohol on a suspect, and the suspect admits to having driven the vehicle, the police officer has probable cause to arrest that individual for driving under the influence." *Id.* at ¶ 31, citing *State v. Lyons*, 11th Dist. No. 97-P-0122, 1999 Ohio App. LEXIS 2623, *6 (June 11, 1999). In the present case, the facts show that Officer Neath arrived at the scene of the accident, Carr did not admit that he was in an accident but did state that he had been driving his car, Neath had been made aware by the witnesses that Carr was driving the vehicle, and the foregoing signs of intoxication were present. When viewing this evidence in conjunction with the evidence of Carr's erratic driving and dangerous speed at which he was travelling, the trial court did not err by finding that there was probable cause to conduct a blood test. *See State v. Corbissero*, 11th Dist. No. 2011-A-0028, 2012-Ohio-1449, ¶ 30 (probable cause to conduct an arrest existed when the defendant was excessively speeding, driving erratically, gave "incredible" responses to questions about his speeding, admitted to having consumed alcohol, and had a strong odor of alcohol on his person).

**{¶50}** In addition, although there were no field sobriety tests taken by Officer Neath, such tests are not necessary for a finding of probable cause to conduct an

arrest.  The "totality of the circumstances can support a finding of probable cause to arrest, even where no field sobriety tests were administered."  *State v. Penix*, 11th Dist. No. 2007-P-0086, 2008-Ohio-4050, ¶ 29.

**{¶51}** Finally, the *Schmerber* court also required that, provided exigent circumstances and probable cause exist, the blood must also be drawn in a reasonable manner.  In this case, the blood was drawn by a nurse who testified to routinely performing such tests and explained the procedure for doing so.  There is no evidence that this was not done using the typical, reasonable procedures used for extracting blood and, therefore, this element of *Schmerber* was met.  *See Capehart*, 2011-Ohio-2602, at ¶ 13 ("because the blood sample was drawn by trained medical personnel using medically acceptable procedures, it is clear that the method used to extract the evidence was reasonable and performed in a reasonable manner").

**{¶52}** Although Carr disputes whether he was under arrest at the time of the blood draw and whether he was "of sound mind" for the purposes of determining whether a blood draw could be done under R.C. 4511.191(A)(4), since we find that the blood draw was proper under *Schmerber*, we need not consider these issues.

**{¶53}** Finally, although Carr discusses various Administrative Code sections that he argues must be followed in order for a blood sample to be admissible, he discusses no specific violation that occurred and points to no evidence supporting the suppression of the evidentiary blood sample based on Administrative Code violations.  Therefore, we find no error in the trial court's conclusion that there were no grounds for suppressing the blood sample due to violations of the Administrative Code.

**{¶54}** The first assignment of error is without merit.

{¶55} In his second assignment of error, Carr argues that his conviction for Operating a Vehicle Under the Influence of Alcohol, pursuant to R.C. 4511.19(A)(1)(a), was against the sufficiency and the weight of the evidence because the evidentiary blood draw done for the State was improperly admitted, the separate medical blood draw was not done in compliance with the Ohio Administrative Code, field sobriety tests were not conducted, and no investigation was done to determine where or how much Carr was drinking on the night of the accident.

{¶56} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury," i.e. "whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary (6 Ed.1990), 1433. Essentially, "sufficiency is a test of adequacy," that challenges whether the state's evidence has created an issue for the trier of fact to decide regarding each element of the offense. *Id.*

{¶57} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In reviewing the sufficiency of the evidence to support a criminal conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶58} Weight of the evidence, in contrast to its sufficiency, involves "the inclination of the greater amount of credible evidence." (Citation omitted.) (Emphasis deleted.) *Thompkins* at 387. Whereas the "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25 (citation omitted). "In other words, a reviewing court asks whose evidence is more persuasive -- the state's or the defendant's?" *Id.* The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses, to determine whether, "in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶59} "Since there must be sufficient evidence to take a case to the jury, it follows that 'a finding that a conviction is supported by the *weight* of the evidence necessarily must include a finding of sufficiency.'" (Emphasis sic.) *Willoughby v. Wutchiett*, 11th Dist. No. 2002-L-165, 2004-Ohio-1177, ¶ 8, quoting *State v. Roberts*, 9th Dist. No. 96CA006462, 1997 Ohio App. LEXIS 4255, *5 (Sept. 17, 1997); *State v. Seijo*, 11th Dist. No. 2011-A-0011, 2012-Ohio-645, ¶ 45.

{¶60} In order to convict Carr of Operating a Vehicle Under the Influence of Alcohol, the State was required to prove, beyond a reasonable doubt, that he was "operat[ing] any vehicle" while he was "under the influence of alcohol, a drug of abuse, or a combination of them." R.C. 4511.19(A)(1)(a).

{¶61} Initially, it is important to note that since the trial court properly admitted the results of the blood sample tested by the Lake County Crime Lab, this evidence will be considered for the purpose of determining whether Carr's conviction was supported by the evidence.

{¶62} Carr does not dispute the element related to whether he was operating a vehicle but only whether he was "under the influence" of alcohol. We find that the evidence in the record supports Carr's conviction for OVI. The evidence showed that Carr was witnessed by several individuals, including Hazen, Stark, and Wessler, driving at a very high rate of speed, driving erratically, and causing the car accident. Wessler explained that Carr was rapidly shifting lanes and causing the tail of the car to "hook." In addition to the evidence of Carr's dangerous driving, Officer Neath testified that there was the strong smell of alcohol on Carr's breath, he had slurred speech, he acted confused, claimed to be unaware of the accident occurring, and admitted to having a glass of wine.

{¶63} In addition to the testimony of witnesses who observed the foregoing behaviors of Carr exhibiting signs of intoxication, the testimony of Rohde also established that Carr's blood alcohol level from the evidentiary blood draw was .202, well above the legal limit. Rohde testified that, to a reasonable degree of scientific certainty, an individual's ability to operate a motor vehicle would be "appreciably impaired" based on the BAC of .202, since he would have a slower reaction time. When considering all of the evidence together, the weight of this evidence supports a finding that Carr was Operating a Vehicle Under the Influence and, therefore, his conviction is supported by sufficient evidence to find him guilty beyond a reasonable doubt. *See*

19

*State v. Lewis*, 11th Dist. No. 2009-L-138, 2010-Ohio-4288, ¶ 62-64 (where appellant was driving a vehicle that had been observed swerving, crashing into another car, and police officers testified that the defendant's breath smelled of alcohol, his speech was slurred, his eyes were bloodshot, and he seemed confused, the jury could have found him guilty of OVI beyond a reasonable doubt); *State v. Urso*, 195 Ohio App.3d 665, 2011-Ohio-4702, 961 N.E.2d 689, ¶ 96-101 (11th Dist.) (where there was evidence of erratic driving, a strong odor of alcohol in defendant's vehicle, beer cans in the vehicle, the defendant had slurred speech, difficulty standing, and a BAC of .286, defendant's conviction was supported by the weight of the evidence).

{¶64} Regarding the issue of the lack of field sobriety tests, Carr asserts that the failure to administer such tests renders the convictions insufficient and against the weight of the evidence. However, convictions for OVI have been upheld by this court in the absence of field sobriety tests. *See Id.* at ¶ 101 (conviction for OVI upheld as supported by the weight of the evidence in the absence of field sobriety test results where police did not feel it would be safe to perform such tests due to the defendant's intoxicated condition); *State v. Fresenko*, 11th Dist. No. 92-L-134, 1993 Ohio App. LEXIS 2975, *8 (June 11, 1993) (where, due to appellant's request to go to the hospital, no field sobriety tests were performed, the totality of circumstances still supported the trial court's finding of guilt). In the present case, since Officer Neath testified that he was unable to perform the field sobriety tests due to Carr's hospitalization, and the totality of circumstances supported a conviction, we cannot find that the lack of such tests in the present matter renders Carr's conviction invalid.

{¶65} While Carr argues that the hospital blood test (not the evidentiary sample tested by Rohde) was not proven to be in compliance with the Administrative Code requirements for conducting a blood draw or testing, because the chain of custody, labeling, and preservation of the sample were not proven, we note that even if it was not taken in compliance, there is still sufficient evidence, as outlined above, to find Carr guilty beyond a reasonable doubt. In addition, regardless of the Administrative Code provisions, the admission of the blood sample was proper under R.C. 4511.19(D)(1)(a). It states that "[i]n any criminal prosecution * * * for a violation of division (A)(1)(a) of this section or for an equivalent offense that is vehicle-related, the result of any test of any blood or urine withdrawn and analyzed at any health care provider * * * may be admitted with expert testimony to be considered with any other relevant and competent evidence in determining the guilt or innocence of the defendant." Courts have noted that this statute allows admission of blood tested by hospitals, even if such a test does not comply with the Administrative Code, in similar circumstances, where a defendant was transported to the hospital after an accident and underwent a non-forensic, medical blood test. *State v. Mendoza*, 6th Dist. No. WD-10-008, 2011-Ohio-1971, ¶ 19; *State v. Davenport*, 12th Dist. No. CA2008-04-011, 2009-Ohio-557, ¶ 16 (the State's failure to prove substantial compliance with the Administrative Code regulations with respect to an established chain of custody and the preservation and labeling of his blood sample, is not applicable when a blood draw was conducted by the hospital). Since the present case involves an offense under R.C. 4511.19(A)(1)(a), the test occurred at a hospital, and was submitted with the testimony of Nurse Berman and Rohde about the methods

used to take the sample and used by the hospital to test such a sample, it was admissible under R.C. 4511.19(D)(1)(a).

{¶66} The second assignment of error is without merit.

{¶67} In his third assignment of error, Carr asserts that the trial court improperly denied his Crim.R. 29 motion to dismiss the Driving Under Suspension charge, since Carr did not have knowledge that his license was suspended on the date of the accident. He asserts that the State failed to show that he was given notice of the suspension, since the only witness that testified regarding the notice did not have personal knowledge of its mailing. In addition, Carr argues that his father informed him that he resolved the suspension, and, therefore, Carr had a "good faith belief" that his license was not suspended.

{¶68} Pursuant to 4510.11(A), "no person whose driver's * * * license * * * has been suspended under any provision of the Revised Code, * * * shall operate any motor vehicle upon the public roads and highways or upon any public or private property used by the public for purposes of vehicular travel or parking within this state during the period of suspension unless the person is granted limited driving privileges."

{¶69} This court has held that "notice of a suspension is an inferred element of a driving under suspension charge." *State v. Heiney*, 11th Dist. No. 2006-P-0074, 2007-Ohio-1200, ¶ 15. "This is because 'it would be fundamentally unfair to convict a defendant for driving while under suspension when that person has not been given notice of the suspension.'" *Id.,* citing *State v. Roy*, 3rd Dist. No. 2-99-27, 2000 Ohio App. LEXIS 361, *5 (Feb. 4, 2000), citing *State v. Gilbo*, 96 Ohio App.3d 332, 338, 645 N.E.2d 69 (2nd Dist.1994). "[O]ne should not be convicted of that offense when he or

22

she has no way of knowing that his or her operator's license has been suspended." *State v. Peer*, 11th Dist. No. 98-T-0179, 1999 Ohio App. LEXIS 5774, *6 (Dec. 3, 1999), citing *Gilbo* at 338.

{¶70} "[W]hile notice is required, the state does not have to prove 'actual notice.'" *Heiney* at ¶ 16; *Peer* at *6. Instead, notice is complete upon deposit of the notice with the postal service for mailing to the driver's last known address via regular mail. *Heiney* at ¶ 16.

{¶71} In the present case, Carr disputes his personal knowledge of his license suspension. However, the testimony of Jones shows that the BMV had a copy of the notice of suspension mailed to Carr. Moreover, Carr's father, Ray, testified that he personally saw the notice of suspension, which he received from Carr while helping Carr take care of financial matters. Ray also paid the reinstatement fee to the state of Ohio on October 4, 2010, prior to the date of the accident, which would make it likely that the notice was received by Carr, informing him of the need to pay such a fee. In fact, Ray testified that he paid the reinstatement fee to the Ohio BMV in response to the notice of suspension mailed to Carr. From the foregoing evidence, it can be concluded that the letter was both mailed to Carr and received by him.

{¶72} Even in light of the foregoing, Carr argues that since his father told him the suspension was taken care of, he did not have actual knowledge that his license was suspended at the time of the accident. However, as noted above, there is no requirement that an individual has actual knowledge of suspension but instead just that notice is mailed to the driver, which occurred in the present case. The fact that Carr

23

failed to remain apprised of his own affairs and ensure that his suspension was lifted is not an excuse and this argument is not supported by the case law.

{¶73} Carr also argues that the BMV failed to comply with Ohio Administrative Code 4501:1-10-02, by failing to prove the date of mailing of the notice. Ohio Adm.Code 4501:1-10-02(B) (the BMV must maintain a file of every notice sent, which contains an identifying number for the notice along with the date of delivery to the United States Postal Service that can be verified by a "'round stamp' or some similar evidence of the date"). Ohio Adm.Code 4501:1-10-02(E) states that "[i]n any proceeding challenging the method of written notice or the proof of mailing for any particular order, the person making the challenge shall establish affirmatively that the bureau of motor vehicles failed to mail the notice * * * in compliance with this rule and rule 4501:1-10-01 of the Administrative Code."

{¶74} While there was some question as to the date of the mailing of the notice, the copy of the notice provided by the BMV was dated as being sent September 1, 2010. Convictions for DUS have been upheld as compliant with 4501:1-10-01 in similar circumstances. In *Peer*, the court found that where the State, through the BMV, presented a copy of the printout of the notice of suspension asserted to have been mailed to the appellant's last known address and there was nothing in the record to indicate that notice was not sent to appellant, there was no violation of the administrative code. 1999 Ohio App. LEXIS 5774, at *9. *See also State v. Acord*, 2nd Dist. No. 16185, 1997 Ohio App. LEXIS 2176, *10 (May 23, 1997), citing *Gilbo,* 96 Ohio App.3d at 339, 645 N.E2d 69 (the conviction for Driving Under Suspension was supported by the evidence and not in violation of the Administrative Code when "a copy

24

of a properly addressed notice of suspension in the defendant's BMV file, without any indication that notice was not sent or that it was returned undelivered" was presented by the State, because it supported a finding that appellant received notice that his license was suspended). In the present matter, the BMV presented a copy of the dated notice that was sent to Carr and he failed to present any evidence that he did not receive the notice. In fact, his own witness, Ray, indicated that Carr did receive the notice mailed by the BMV. Since all of the evidence presented supported a finding that Carr received the notice, we cannot find a basis for reversing his conviction due to a lack of notice or knowledge of the license suspension.

{¶75} The third assignment of error is without merit.

{¶76} Based on the foregoing, the judgment of the Lake County Court of Common Pleas, denying Carr's Motion to Suppress and finding him guilty of two counts of Aggravated Vehicular Assault, one count of Vehicular Assault, two counts of Operating a Vehicle Under the Influence of Alcohol, and one count of Driving Under Suspension, is affirmed. Costs to be taxed against appellant.


TIMOTHY P. CANNON, P.J.,

THOMAS R. WRIGHT, J.,

concur.